ATTORNEY DISCIPLINARY PROCEEDINGS
 

 PER CURIAM.
 
 *
 

 |, This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel (“ODC”) against respondent, Adam F. Hutton, an attorney licensed to practice law in Louisiana.
 

 UNDERLYING FACTS
 

 Respondent’s brother, Steven Allen Hutton (“Steve”), was married in April 1996 to his second wife, Landra Hutton (“Lan-dra”). Steve and Landra had no children together but Landra had two young sons from a previous marriage.
 

 During the marriage, Steve worked for Sperry-Sun, a subsidiary of the Dresser-Rand Company. On April 24, 1997, Steve signed a “Dresser Benefits Family Information Form,” naming Landra as the primary beneficiary of his life insurance policy. Sometime thereafter, Sperry-Sun was acquired by Halliburton Energy Services, Inc. (“Halliburton”), and Steve went to work for Halliburton.
 

 Steve’s employment with Halliburton required him to work overseas for extended periods of time. Steve’s long absences from the United States caused strain in his personal life, and by the fall of 1999, Steve and Landra had mutually decided to divorce. Respondent prepared a community property settlement and partition |2which Landra executed on November 5, 1999.
 
 [1]
 
 Respondent signed the community property partition on Steve’s behalf pursuant to a power of attorney granted to him by Steve on November 1, 1999. Steve and Landra’s divorce was final on August 30, 2000. Less than four months later, on December 22, 2000, Steve was killed in an automobile accident in Saudi Arabia while -working for Halliburton.
 

 Within days of his brother’s death, respondent was able to access computer records reflecting that the value of Steve’s life insurance policy was in excess of $800,000. These records did not show who the beneficiary of the policy was, and Halliburton refused to disclose the name of the beneficiary to respondent, although the company did confirm that respondent was not the designated beneficiary, nor were his two siblings. After receiving this information, respondent decided that his former sister-in-law was most likely still the beneficiary of the policy. In fact, respondent was correct, as an online log entry generated by a Halliburton benefits employee on December 28, 2000 confirmed that based upon “the bene form for the life and AD & D coverages,” Steve’s “ex wife Landra is the bene .... $ will probably pay to ex wife.... ”
 

 However, respondent did not personally believe that Landra should benefit from Steve’s death. On December 29, 2000, the day before Steve’s funeral, respondent
 
 *769
 
 spoke with Landra concerning pictures of Steve that were to be displayed at the funeral service. Although Landra had expected to meet respondent at his home to deliver the pictures, he called her prior to the meeting and asked her to come to his office instead. When Landra arrived, there was no one else present. After spending a few moments crying together and reminiscing about Steve, respondent presented Landra with a document entitled
 
 Express Assignment of Claims Against Halliburton, Inc. and/or John Hancock Insurance Company by Landra Cornwall Hutton [individually], and Landra Cornwall Hutton as natural tutrix of Robert Miller and Matthew Miller.
 

 [2]
 

 The assignment, drafted by respondent, provided that in consideration of the sum of $25,000, Landra assigned to respondent “any and all sum or sums now due or owing said assignors, and all claims, demands and cause or causes of action of whatever kind and nature which said assignors had or now have or may have against HALLIBURTON, INC. AND/OR JOHN HANCOCK INSURANCE COMPANY, arising out of the injury and death of Steven Allen Hutton, ...” The Express Assignment did not state that the life insurance policy was worth $817,570.78, and respondent admits that he did not specifically disclose that information to Landra. Rather, according to respondent, he simply told Landra that there was “a chance” she could be the beneficiary of Steve’s life insurance policy;
 
 [3]
 
 that he did not think that was what Steve would have wanted; and that he would like for her to sign those rights over to him in exchange for $25,000. According to Landra, however, respondent told her that he did not know if she was still the beneficiary of the life insurance policy, but in the event she was, the funeral home needed “a guarantee” that if there were any unpaid expenses from Steve’s funeral she would cover them. Having remained on friendly terms with her former husband since the divorce, and not wishing to prevent him from receiving a proper burial, Landra signed the assignment. She concedes that she did not read the Express Assignment before signing it, nor did she ask respondent to provide her with a copy of the ^document.
 
 [4]
 
 Respondent then gave Landra a check for $25,000, which according to Landra he insisted that she take for the benefit of her two young boys.
 

 On January 2, 2001, respondent sent the Express Assignment to Halliburton, along with a copy of Steve and Landra’s community property settlement and partition. On January 5, 2001, Landra received a letter from Halliburton regarding the life insurance policy. Landra showed the letter to respondent, who told her that she would not receive any life insurance proceeds because the document she had signed at his office on December 29, 2000 had assigned all her rights in the policy to
 
 *770
 
 him. Respondent then directed Landra to write a letter to Halliburton instructing the company to remit the proceeds to him. Pursuant to Landra’s instructions, on February 28, 2001, John Hancock issued three checks payable to respondent in the total amount of $817,570.78, representing the value of Steve’s life insurance policy and the accidental death benefits. Respondent testified that he deposited the checks into his bank account before dividing the money equally with his brother and sister, retaining a third for himself. Respondent testified that the funds have since been exhausted and that he is now “judgment proof.”
 
 [5]
 

 On December 21, 2001, Landra filed suit against respondent, Halliburton, and John Hancock, seeking recovery of the life insurance proceeds. Landra subsequently | Bdismissed her claims against Halliburton and John Hancock, leaving respondent and his malpractice carrier as the sole remaining defendants. The suit remains pending.
 

 DISCIPLINARY PROCEEDINGS
 

 In August 2002, Landra filed a complaint against respondent with the ODC. Following its investigation, the ODC filed one count of formal charges, alleging that respondent’s conduct as set forth above violated Rules 8.4(a) (violation of the Rules of Professional Conduct) and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) of the Rules of Professional Conduct. The ODC further alleged that respondent provided legal advice and representation to Landra in various matters both before and after the execution of the December 29, 2000 Express Assignment,
 
 [6]
 
 and therefore engaged in a prohibited business transaction with a client, in violation of Rule 1.8(a) (a lawyer shall not knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client).
 
 [7]
 
 Alternatively, in the event there was not an attorney/client relationship between respondent
 
 *771
 
 and Landra prior to the execution of the Express Assignment, the ODC alleged that he violated Rule 4.3 (dealing with unrepresented persons) by giving legal advice to a 1 ¡¡person who is not represented by counsel. Respondent answered the formal charges and denied any misconduct.
 

 This matter then proceeded to a formal hearing on the merit s, at which respondent and Landra were the only witnesses. During the hearing, respondent and the ODC presented the following joint stipulation of facts:
 

 1. Respondent has a brother who is now deceased whose name is Steven Hutton.
 

 2. Steve and the complainant, Landra Hutton, were previously married but were divorced on August 30, 2000, prior to Steve’s death.
 

 3. On or about December 22, 2000, Steve was killed in an automobile accident in Saudi Arabia.
 

 4. On December 29, 2000, respondent met alone with Landra at his law office.
 

 5. Steve’s funeral took place on Saturday, December 30, 2000.
 

 6. On January 2, 2001, respondent faxed to Halliburton a copy of a December 29, 2000 express assignment and a copy of a November 5, 1999 community property partition agreement between Landra and Steve.
 

 7. On February 28, 2001, John Hancock Insurance Company issued three checks payable to respondent, representing $817,570.78 in total life insurance proceeds.
 

 Hearing Committee Report
 

 After considering the evidence and testimony presented at the hearing, the hearing committee made the following findings:
 

 Prior to meeting with Landra on December 29, 2000, respondent knew that Steve had a life insurance policy with Halliburton, the value of which was at least $800,000. He also knew that he and his siblings were not the beneficiaries of the |7policy. Moreover, respondent did not have any documents or information in hand that named Steve’s estate or some person other than Landra as the beneficiary-
 

 Despite his knowledge of this information, respondent drafted the Express Assignment for execution by Landra. He failed to advise her of the total value of the life insurance policy, failed to advise her of the identity, known or unknown, of the beneficiary of the policy, and failed to advise her of her right or the potential need to seek independent counsel prior to securing her signature on the Express Assignment.
 

 Respondent contends that he advised Landra of the need for, and the legal effects that flowed from, the Express Assignment. Respondent testified that he told Landra that he thought there was a chance that she might be the beneficiary of Steve’s life insurance policy, and that in the event she was, he did not think that was what Steve would have wanted, “and that what I’d like you to do is to sign those rights over to me; in exchange for that I’ll give you $25,000.00.”
 

 Based on these findings, the committee found that respondent violated Rules 4.3 and 8.4(a) of the Rules of Professional Conduct. In his dealings with Landra regarding the life insurance policy, respondent gave legal advice to an unrepresented person other than the advice to secure counsel. Respondent knew or reasonably should have known that Landra’s interests were or had a reasonable possibility of being in conflict with his interests as Steve’s brother. Further, respondent knew or should have known that Landra
 
 *772
 
 misunderstood his role in the matter, and as such, should have made a reasonable effort to correct any misunderstanding.
 

 Turning to the alleged Rule 8.4(c) violation, the committee noted, again, that prior to meeting with Landra on December 29, 2000 respondent was aware of certain key facts and information regarding Steve’s life insurance policy. Respondent did not share this information with Landra before she executed the Express Assignment. He Istestified that he “summed up the agreement” to Landra on December 29, 2000 and told her that “if you have any rights you will lose them.” Respondent further testified that he was willing to offer Landra $25,000 in return for any rights she may have had. On the other hand, Landra testified that when respondent first presented the Express Assignment to her, she was under the impression that the funeral home needed the document to guarantee payment of any unpaid funeral expenses.
 

 Landra testified that the Express Assignment was executed by her at respondent’s office outside the presence of a notary. A review of the Express Assignment indicates that the document was purportedly signed in the notary’s presence. Lan-dra further testified that respondent gave her the $25,000 check after they left the notary’s office and told her that he knew she was “having it hard right now” and wanted her to take the check. Considering this testimony, and after reviewing the language of the Express Assignment, the committee found that respondent misled Landra as to the true purpose for the Express Assignment and for the $25,000 payment, in violation of Rule 8.4(c).
 

 Rule 1.8(a) prohibits a lawyer from engaging in a business transaction with a client or knowingly acquiring an ownership, possessory, security, or other pecuniary interest adverse to a client when the terms are unfair and unreasonable, and the client is not afforded a reasonable opportunity to obtain independent counsel. The ODC asserts that respondent provided legal advice and representation to Landra in various matters before and after the December 29, 2000 Express Assignment, and that Landra reasonably relied upon respondent as both her attorney and former brother-in-law and believed he was acting in her best interest with respect to the Express Assignment. Respondent rejects this allegation, contending he did not have a professional relationship with Lan-dra until after the Express Assignment was executed.
 

 | gLandra claims that respondent represented her in her divorce from Steve and testified that she thought or believed that respondent was actually looking out for her best interests in the community property settlement agreement that he prepared in November 1999. However, the committee noted that the settlement agreement clearly reflects that respondent was representing Steve in the proceeding.
 

 Although the committee could not reach a determination as to what Landra actually thought or believed at the time she executed the Express Assignment, it found that the terms of the Express Assignment were of such a nature that respondent should have given Landra a reasonable opportunity to obtain independent counsel. Respondent prepared and sought Landra’s signature to a contractual agreement by which he would knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to her. The committee further found that the $25,000 given in exchange for $817,570.78 in life insurance benefits was unconscionable, unfair, and unreasonable. Accordingly, respondent clearly violated Rule 1.8(a).
 

 The committee determined that respondent violated duties owed to his client, the
 
 *773
 
 public, and the legal profession. His conduct was intentional and caused actual harm to Landra, who was deprived of her pecuniary interest in Steve’s life insurance policy. Considering the ABA’s
 
 Standards for Imposing Lawyer Sanctions,
 
 the baseline sanction for respondent’s misconduct is disbarment.
 

 The committee found the following aggravating factors apply: a dishonest or selfish motive, refusal to acknowledge the wrongful nature of the conduct, vulnerability of the victim, and indifference to making restitution. In mitigation, the committee found that respondent has no prior disciplinary record.
 

 Considering all the circumstances, the committee recommended that respondent be disbarred.
 

 | ^Respondent filed an objection to the hearing committee’s report, arguing that the formal charges should be dismissed. Respondent also asserted that he was deprived of due process of law by the committee.
 

 Disciplinary Board Recommendation
 

 A panel of the disciplinary board heard oral argument in this matter on January 29, 2009. Days before oral argument, on January 23, 2009, respondent filed a motion to supplement the record with the deposition of Robert Hayter, Halliburton’s in-house counsel for benefits, taken during the civil case filed by Landra against respondent.
 
 [8]
 
 The board granted the motion, in part to facilitate its evaluation of respondent’s claim that he was deprived of due process by the hearing committee; however, the board ultimately gave Mr. Hayter’s testimony no weight.
 
 [9]
 

 In its report, the disciplinary board initially addressed respondent’s complaint that he was deprived of due process in this matter. First, he implies that it is unconstitutional “to disbar a young lawyer on the grounds of a swearing match between him and an individual seeking to recover money from him in a civil lawsuit.” The board found this argument is unsupported by any legal authority and is frivolous. First and foremost, it is primarily respondent’s own testimony, not Landra’s | n testimony, which along with the documentary evidence establishes the misconduct in this case. Secondly, under respondent’s reasoning, a lawyer could never be disciplined on the basis of a credibility determination between the lawyer and the complainant. The board observed that like the justice system generally, credibility evaluations are inherent in the lawyer disciplinary system. Such evaluations are made by hearing committee members, who “act as the eyes and ears” of the court.
 
 See In re: Bolton,
 
 02-0257 (La.6/21/02), 820 So.2d 548.
 

 
 *774
 
 Respondent’s second due process argument pertains to his allegation that the committee “impermissibly crossed the line from an adjudicative function to a prosecu-torial function” because they asked him questions at the hearing. The board observed that respondent does not cite any case law to support his serious allegation of improper conduct by the committee. The board further noted that the committee did not “adjudicate” respondent’s disbarment; rather, the committee reported a recommendation. In any event, after reviewing the portions of the hearing transcript of which respondent complained, the board found “nothing more than a search for the truth which does not offend due process.” Given that each hearing committee is tasked with being “the eyes and ears of [the supreme] court,” the board concluded that there is nothing improper in committee members asking questions and pursuing forthright answers.
 

 Turning to the merits of this matter, the board found that the facts surrounding the assignment of rights to respondent are essentially undisputed, as respondent has admitted that he drafted that document, presented it to Landra without fully informing her of the consequences, and asked that she execute it. Respondent has further admitted that he acted in an effort to thwart Landra from receiving the benefits of Steve’s life insurance policy because he believed that Landra should not receive the |12money, notwithstanding that Steve had made a legally binding election for Landra to receive the benefits. Respondent testified that he believed it was “more probable than not that Landra was still the beneficiary of the life insurance policy” when Steve died. The ODC further submitted evidence that Steve and Landra remained on relatively good terms after their divorce, and that not having any children of his own, Steve was fond of Lan-dra’s children. Finding this evidence is unrefuted, the board upheld the committee’s finding that the ODC proved by clear and convincing evidence that respondent committed misconduct by having Landra make an uninformed assignment to him of Steve’s life insurance benefits. Respondent actively concealed from Landra the true value of the life insurance proceeds, in violation of Rule 8.4(c) of the Rules of Professional Conduct.
 

 The board also found that by his actions, respondent formed an attorney/client relationship with Landra at the time he presented her with the Express Assignment. However, he failed to afford Landra a reasonable opportunity to have independent counsel review the Express Assignment before she signed away the right to collect approximately $818,000 in life insurance benefits. The board determined that this conduct violated Rule 1.8(a).
 
 [10]
 

 Lastly, the board found respondent violated Rule 8.4(a). As respondent testified, his goal all along was to deprive Landra of the proceeds of a life insurance policy which were lawfully designated to her. Additionally, while this provision received little attention at the hearing, the Express Assignment drafted by respondent contains language purporting to sign away not only the rights that Landra had for herself, but any rights that her minor children may have had as well. By employing such language, the board concluded that respondent intended that no one other than | ^himself or his siblings should receive the life insurance payout, no matter what Steve’s beneficiary designation may have been.
 

 
 *775
 
 The board determined that respondent violated duties owed to his client, the public, and the profession. His conduct was knowing and intentional, and caused serious harm. The board accepted the aggravating and mitigating factors found by the committee. Considering the ABA’s
 
 Standards for Imposing Lawyer Sanctions,
 
 the baseline sanction for respondent’s misconduct is disbarment.
 

 Characterizing respondent’s dealings with Landra as “simultaneously dishonest and motivated by self interest,” the board recommended that respondent be disbarred. The board further recommended that respondent make restitution to Lan-dra of the full amount of the life insurance proceeds, less the $25,000 he paid her in connection with the Express Assignment.
 

 Respondent filed an objection to the disciplinary board’s recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).
 

 DISCUSSION
 

 Bar disciplinary matters fall within the original jurisdiction of this court. La. Const, art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence.
 
 In re: Quaid,
 
 94-1316 (La.11/30/94), 646 So.2d 343;
 
 Louisiana State Bar Ass’n v. Boutall,
 
 597 So.2d 444 (La.1992). While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard [ 14is applicable to the committee’s factual findings.
 
 See In re: Caulfield,
 
 96-1401 (La.11/25/96), 683 So.2d 714;
 
 In re: Pardue,
 
 93-2865 (La.3/11/94), 633 So.2d 150.
 

 It is undisputed that respondent drafted an assignment of life insurance benefits for execution by his former sister-in-law, and paid her $25,000 in connection with the assignment. At the time that he presented the document to Landra, respondent knew that the value of his brother’s life insurance policy was in excess of $800,000, and that neither he nor his siblings were the designated beneficiaries of the policy. Rather, respondent was certain that Landra was the beneficiary, but he did not believe that she should benefit from Steve’s death, regardless of the legally binding election made by Steve. The hearing committee made a factual finding that respondent misled Landra as to the true purpose for the assignment of rights and for the $25,000 payment. This finding is supported by the record, and based on this finding, respondent violated Rules 8.4(a) and 8.4(c) of the Rules of Professional Conduct.
 
 [11]
 

 Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent’s actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct.
 
 Louisiana State Bar Ass’n v. Reis,
 
 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved
 
 *776
 
 considered in light of any aggravating and mitigating circumstances.
 
 Louisiana State Bar Ass’n v. Whittington,
 
 459 So.2d 520 (La.1984).
 

 |1fiWe find that respondent acted intentionally, and caused Landra actual harm. Under the ABA’s
 
 Standards for Imposing Lawyer Sanctions,
 
 the applicable baseline sanction in this matter is disbarment.
 

 The following aggravating factors apply: a dishonest or selfish motive, refusal to acknowledge the wrongful nature of the conduct, vulnerability of the victim, and indifference to making restitution. In mitigation, respondent has no prior disciplinary record.
 

 Under the facts of this case, we find there is no justification for any downward deviation from the baseline sanction. Following his brother’s death, respondent used his legal training to defraud Landra of the life insurance proceeds to which she was entitled because he decided that she should not receive them. Such conduct by a lawyer is simply indefensible. Accordingly, we will adopt the disciplinary board’s recommendation and impose disbarment.
 
 [12]
 

 DECREE
 

 Upon review of the findings and recommendations of the hearing committee and the disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Adam F. Hutton, Louisiana Bar Roll number 25718, be and he hereby is disbarred. His name shall be stricken from the roll of attorneys and his license to practice law in the State of Louisiana shall be revoked. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.
 

 *
 

 Judge Benjamin Jones, of the Fourth Judicial District Court, assigned as Justice
 
 Pro Tem-pore,
 
 participating in the decision.
 

 [1]
 

 . Landra was not represented by separate counsel in this matter; rather, Landra testi-lied that she believed respondent was acting as both her attorney and as the attorney for his brother.
 

 [2]
 

 . John Hancock issued Halliburton's group life insurance policy.
 

 [3]
 

 . Respondent testified in his sworn statement that he also considered the possibility that the beneficiary of his brother's life insurance policy may have been his girlfriend, his first ex-wife, or the charities he supported, like the SPCA. However, respondent conceded that he ultimately did not seek out any of these individuals or entities to obtain an assignment of rights from them, nor did he ever consider the possibility of doing so.
 

 [4]
 

 . Regarding the circumstances under which she executed the Express Assignment, Landra testified at the hearing that she trusted respondent and “wasn't in the right frame of mind ... I was emotional. I was upset.” In his testimony, respondent acknowledged that he knew Landra was in an emotional state but "did not consider it” because “I wanted to make sure that ... she did not benefit from my brother's death.”
 

 [5]
 

 . Respondent explained that his portion of the funds were “depleted” as the result of various expenditures, including “stock losses, gambling losses, vacations, you know, whatever, ...” When asked whether today he would give his share back to Landra if he had it, respondent answered, "No." Indeed, respondent testified that he would do nothing differently if he had the chance:
 

 I’ve certainly thought about it just about every day since all this came about and certainly still think about my brother every day, and I've run it over a million times in my mind I promise you, and I don’t think I would have done anything different.
 

 [6]
 

 . These matters include the following: (1) When she was eighteen years of age, Landra was convicted of simple robbery. Subsequently, during her marriage to Steve, Landra sought legal advice from respondent on the expungement of her criminal record. Landra discussed the matter with respondent while he was in law school and after respondent became a lawyer (prior to Steve’s death), and respondent continued to advise Landra on this issue after Steve's death. (2) Before marrying Steve, Landra was married to and had two children with Richard Miller. Landra discussed with respondent her legal rights in seeking an increase in Mr. Miller's child support obligation to her. These discussions took place while respondent was in law school and after he became a lawyer (prior to Steve’s death), and respondent continued to advise Landra on this issue after Steve’s death. (3) Following Steve's death, Landra’s mother wanted to travel outside Louisiana with Lan-dra’s children. To facilitate the travel, respondent drafted and notarized a power of attorney authorizing Landra’s mother to seek any necessary medical treatment for the minor children during the trip.
 

 [7]
 

 . The ODC stipulated that respondent did not represent Landra in connection with the December 29, 2000 Express Assignment. However, the disciplinary board rejected this stipulation and found that the record supports a determination that respondent was, in fact, representing Landra in connection with the Express Assignment. Both respondent and the ODC objected to the board's determination in this regard.
 

 [8]
 

 . Respondent’s counsel represented that Mr. Hayter’s deposition had not been introduced at the hearing before the hearing committee (at which time respondent did not have counsel) because "Respondent was too emotionally distraught at the end of the hearing ... to remember to introduce this exhibit ...”
 

 [9]
 

 . During his deposition, Mr. Hayter testified that for a time, "there was nothing on file” reflecting the beneficiary of Steve’s life insurance policy, and that he was personally unaware of any such designation by Steve prior to his death. The board concluded that Halliburton’s confusion was due to the fact that Steve made his election while working for Sperry-Sun, which Halliburton later bought. Furthermore, the board rejected the relevance of Mr. Hayter's1 testimony on the issue of beneficiary designation, stating that "the insurer's beliefs, not Halliburton's, control who may be paid under the policy.... We note that if it has any relevance, the testimony of the Halliburton representative is entirely consistent with ODC's showing that Mr. Hutton attempted to exploit any confusion that arose from his brother's employer being acquired by Halliburton, in order to substitute himself as payee.”
 

 [10]
 

 . The board determined that the committee erred in finding a violation of both Rules 1.8(a) and 4.3, as these rules are mutually exclusive.
 

 [11]
 

 . The ODC also charged respondent with dealing improperly with an unrepresented person, in violation of Rule 4.3, or entering into an improper business transaction with a client, in violation of Rule 1.8(a). However, those charges are largely ancillary to the Rule 8.4(c) violation, which is the "heartland” of the misconduct in this matter.
 
 See In re: Simon,
 
 04-2947 (La.6/29/05), 913 So.2d 816;
 
 In re: Rome,
 
 01-2942 (La.9/26/03), 856 So.2d 1167.
 

 [12]
 

 . We do not adopt that portion of the board’s recommendation calling for respondent to make restitution to Landra of the net life insurance proceeds. Rather, that issue is most appropriately addressed in the pending civil litigation.